Filed 10/27/21  In re Ar.M. CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| In re Ar.M. et al., Persons Coming Under the Juvenile Court Law. | D078995 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>A.M.,<br><br>Defendant and Appellant. | (Super. Ct. No. J520197A-B) |

APPEAL from orders of the Superior Court of San Diego County, Marian F. Gaston, Judge.  Affirmed.

Jacob I. Olson, under appointment by the Court of Appeal, for Defendant and Appellant.

Lonnie J. Eldridge, County Counsel, Caitlin E. Rae, Chief Deputy County Counsel, and Jesica N. Fellman, Deputy County Counsel, for Plaintiff and Respondent.

A.M. (Father) appeals from dispositional orders issued by the juvenile court in the Welfare and Institutions Code[1] section 300, subdivision (c) dependency proceedings for his 16-year-old daughter, Ar.M., and his 13-year-old son, Al.M. Father contends there is insufficient evidence to support the dispositional orders removing the children from his custody and the court's findings that reasonable efforts were made to prevent their removal from him. We reject Father's claims and affirm the orders.

FACTUAL AND PROCEDURAL BACKGROUND[2]

In 2003, E.M. (Mother) and Father began living together and apparently married in 2004. Mother gave birth to Ar.M. in 2005 and Al.M. in 2007.

In 2018, Mother and Father began divorce proceedings. In June 2019, the family court awarded Mother and Father joint legal and physical custody of the children. However, in September 2019, the family court ordered that Father have sole physical custody of the children.

In November 2019, the San Diego County Health and Human Services Agency (Agency) filed section 300, subdivision (c) dependency petitions for the children, alleging they had suffered, or were at substantial risk of suffering, serious emotional damage as evidenced by their severe anxiety, depression, withdrawal, or aggressive behavior toward themselves or others. In its detention report, the Agency stated that in late September, Al.M. had slapped and shoved Father and Ar.M. reported that Father also slapped and

---

[1] All further statutory references are to the Welfare and Institutions Code.

[2] Additional factual and procedural background can be found in our prior appeal in this case, *In re Ar.M.* (Nov. 25, 2020, D077621) [nonpub. opn.] (*Ar.M. I*).

2

pushed Al.M. Al.M. was then hospitalized after acting as if he were going to choke himself with a necklace. Al.M. disclosed that his behavior was the result of Father speaking negatively about Mother. In the hospital waiting room, Mother "bad-mouthed" Father in front of Al.M. and the parents yelled at each other regarding how the other was a bad parent. In October, Ar.M. was hospitalized twice due to reportedly being suicidal. The Agency reported that Ar.M. had a history of cutting herself. In late October, Ar.M. obtained a temporary restraining order against Father based on allegations that he continuously berated her for self-harming behavior and having an eating disorder. Ar.M. also stated that after hearing her parents argue, she becomes anxious and vomits. The Agency stated that the parents had placed their children in the middle of a custody battle, which, if it were to continue, would cause them anxiety, depression, continued suicidal ideation, and, possibly, serious physical injury or death. At the detention hearing, the court found the Agency had made a prima facie showing in support of the petitions, detained the children out of their home, and ordered supervised visitation for the parents. The Agency subsequently detained the children in the home of their adult sister, M.J.

In its initial jurisdiction and disposition report and addenda thereto, the Agency stated that Ar.M. refused to visit with Father. Ar.M. and Al.M. stated that they did not want to live with Father and instead wanted to live with Mother. In February 2020, Ar.M. was hospitalized for self-harming behavior and substance abuse. The Agency initially recommended that the court make a true finding on the petitions' section 360, subdivision (c) allegations and place the children out of the home in the approved home of a relative (M.J.) while the parents participate in reunification services. In its June addendum report, the Agency recommended that the children instead

be placed with Mother. The Agency stated that Ar.M. had been very unstable, unable to address her mental health and substance abuse problems, and had struggled in her placement with M.J. Ar.M. appeared to have gained some stability in Mother's care.

At the June 10, 2020 contested jurisdiction and disposition hearing, the court made true findings on the petitions' section 300, subdivision (c) allegations and declared the children to be dependents of the court. The court then ordered that the children be placed with Mother and that family maintenance services be provided to the parents. Father appealed the jurisdictional and dispositional orders.

On November 25, we issued our opinion in *Ar.M. I*, affirming the jurisdictional orders, reversing the dispositional orders, and remanding the matter for the juvenile court to conduct a new disposition hearing. We concluded that the court erred by removing the children from Father's physical custody without making the express findings required by section 361, subdivision (c) that there would be a substantial danger to the well-being of the children if they were returned to his custody and there were no reasonable means to protect them without their removal from him.

In her November report, the children's court-appointed special advocate (CASA) reported that Ar.M. and Al.M. stated that they were happy in their placement with Mother and wanted to continue to live with her. The CASA believed that placement with Mother was beneficial to both children and that Mother was a positive influence on their well-being. Ar.M.'s 18-year-old boyfriend also lived with them in Mother's home. The CASA had no placement concerns regarding Ar.M.'s boyfriend. However, the CASA was concerned that Ar.M. had not been regularly attending online classes through her high school.

4

In its December status review report, the Agency stated that Father had minimal contact with it since October 2020 and had not made any behavioral changes during the review period. Father continued to engage in verbal and written arguments with Mother, which appeared to continue to damage his relationship with his children. Father continued to blame Mother for their children's lack of emotional well-being and failed to take any responsibility for his own behavior, or acknowledge how it had contributed to the family's problems. The Agency stated that although Father had been provided with recommended services, he did not appear to be willing or able to make the necessary changes to stabilize the children's well-being. The children had stated that they would become emotionally unstable and suffer emotional distress if they were asked to visit with Father. The Agency acknowledged that Mother seemed to lack essential parenting skills and had made minimal effort to encourage the children to participate in school and services. It noted that Mother tended to capitulate to the children's demands. For example, Mother allowed Ar.M.'s adult boyfriend to move into their home as a way to avoid setting boundaries for Ar.M. and to prevent her from running away. Although Mother could improve her parenting by setting limits and expectations from the children, the Agency had not identified any current health or safety risks to the children while in her care. Accordingly, the Agency recommended that the children continue to be placed with Mother.

In its January 2021 addendum report, the Agency stated that Al.M. was falling behind in his schoolwork and Ar.M. had been hospitalized again on experiencing a mental health crisis. Neither child wished to have any contact with Father at that time.

In its April addendum report, the Agency repeated that both children indicated they did not want to visit with Father. Nevertheless, Ar.M. expressed an interest in speaking with Father if he would keep an open mind, and Al.M. stated he would be open to text messages or phone calls with Father. In March, the Chadwick Center denied the Agency's referral for therapy services for Ar.M. because of her "high needs." Also in March, the Agency's social worker spoke with Father, who expressed concern that the Agency would allow his children to remain in Mother's care and stated that he felt discriminated against as a father. He expressed his disagreement with Mother's lack of boundaries for the children. He stated that he would have Ar.M. stay home and not allow her boyfriend to reside in the home. As to Al.M., he would monitor him to ensure he was completing his schoolwork and give him more structure. In late March, Father informed the social worker that he was planning to move to Northern California because he needed to care for his ill mother, he had no job, and the Agency refused to allow him to see the children. In early April, Father informed the social worker that he had a new job with insurance benefits for the children.

In the assessment portion of its addendum report, the Agency stated that it remained concerned about Father's lack of insight into the children's protective issues and failure to take responsibility for how his own behaviors and comments negatively affect the children. In conversations with the Agency's social worker, Father had minimized the children's mental health needs and blamed Mother for their emotional and mental health needs. The Agency stated that Father's lack of focus on the children's mental health needs was "of extreme concern" to it. The Agency stated that if either of the children were to be placed with Father, it would be concerned that he would minimize their mental health needs and dismiss their statements about their

6

mental health needs and challenges, thereby placing each child at an elevated risk of another suicide attempt or other self-harm. The Agency was concerned that, if Father were unable to accept that the children needed additional services, he would be unable to provide them with the necessary support to maintain their mental health stability. It stated that despite Father's participation in services, he had not made any behavioral changes to address the issues that led to the children's removal, continued to criticize Mother, and did not communicate with her in a respectful way to coparent and meet the children's needs. The Agency acknowledged that Mother could make more effort to set boundaries for the children and understood that Mother would give in to their demands or requests to prevent them from running away or becoming suicidal. Nevertheless, it believed Mother was making some effort to set boundaries and expectations for the children, despite their challenging those rules and boundaries as expected due to their ages.

In its May addendum report, the Agency reported that the children stated they were not currently interested in visiting with Father. It also stated that Ar.M. had undergone a psychological evaluation and the psychologist reported to the Agency that the family's world was "troubling." He stated that Ar.M. was at significant risk of further self-harm, had expressed desperation and hopelessness, and had a troubling relationship with Mother. He recommended that the Agency engage Ar.M. with effective mental health treatment (i.e., at least weekly therapy) as soon as possible to address her challenges, which included posttraumatic anxiety and bulimia. The Agency also reported that Father stated he would be willing to travel to San Diego for visits with the children.

At the new contested disposition hearing in May on remand after *Ar.M. I*, the juvenile court admitted in evidence reports and other documents offered by the Agency and Father and heard the testimony of Father, Father's parenting advocate (Johnny Norris), and the Agency's social worker (Perla Hernandez).

Father testified that he was living with his mother and brother in Oakland. He testified that prior to the instant dependency proceedings, Ar.M. had been hospitalized many times and Al.M. had been hospitalized twice. He contended that Al.M.'s hospitalization in 2019 was "blown out of proportion," and he claimed that all of Ar.M.'s hospitalizations occurred while in Mother's care. He had not spoken with the children since early October 2020 and believed they did not want to visit with him because he was the stricter parent. Father expressed concern about Mother's lack of supervision of the children because she was always working and allowed them to do whatever they wanted. In contrast, he always pushed the children to do things they did not want to do (e.g., schoolwork). He claimed that Mother had kicked Ar.M. out of her home several times and he disagreed with her allowing Ar.M.'s adult boyfriend to live in the home. Father testified that he accepted Al.M. regardless of his autism diagnosis or sexuality and was concerned about his isolation, development, and the absence of a father figure in his home. Father testified that if the children were returned to his care, he would ensure their safety by continuing their services and addressing Ar.M.'s substance abuse through treatment and medication. He testified that the children were "fine, but they're having a lot of issues." When asked what services his son might benefit from, Father said he did not know and contended "from when they were with [him], they were happy." He said he would have his mother and brothers (the paternal grandmother and paternal

8

uncles) assist him in caring for the children. He believed the children were making "a manipulated threat" regarding their mental health if they were placed in his care because they were happier living with Mother. He repeatedly indicated the children's mental health issues were "just an excuse to threaten [him] because they don't want to leave" their current placement with Mother.

On cross-examination, Father confirmed that if the children were returned to his care, Ar.M. would be living in the same home with the paternal uncle whom—according to Father—she "allegedly claimed molested her" in the past. He admitted that before the instant dependency petitions were filed, he had taken the children to Oakland to visit his family, including that paternal uncle. The day after their return, Ar.M. was hospitalized and had not lived with Father since then. After stating it was "a rude question," Father admitted it was not healthy for Ar.M. to live in the same home as the paternal uncle. Nevertheless, Father believed the living situation would not be a problem because Ar.M. would be spending time with Father rather than her uncle. Father denied that he had any role in, or contributed to, the children's depression or anxiety and stated his only flaw as a parent was taking on too much as a single parent. He did not believe the children would engage in any self-harm if returned to his care because they only threatened self-harm to get what they wanted. Father eventually testified that he took their statements seriously. Father admitted that he was unaware of the children's current status at school—including Al.M.'s promotion from eighth grade and Ar.M.'s passing grades—and that he had not asked the social worker about their status. Father further admitted that he was able to contact Al.M.'s school directly, but he had not done so (other than discussing his IEP) because he was busy. He admitted that it would not be in Ar.M.'s

9

best interest to be ordered to live with Father at that time, and Ar.M. would need further services to stabilize before it would be appropriate for her to return to his care.

Father's parenting advocate testified that it was his impression the Agency was being dismissive of Father's concerns and was biased against fathers, including Father, in the child welfare system. He further testified that Father had gained from his mentorship, as shown by Father's calmer communication.

The Agency's social worker, Hernandez, testified that she had been assigned to the children's dependency cases since late September 2020. Hernandez opined that it was not safe for the children to return to Father's care because both children had stated their mental health would suffer if returned to his care, and Ar.M. was afraid of the paternal uncle who sexually abused her and was living with Father. Hernandez testified that there were no additional services available that would allow the children to safely return to Father's care. Although Mother needed to improve her parenting, including setting limits for the children, Hernandez believed that Mother was meeting the children's needs and there was no safer placement for them. Regarding videos from Ar.M.'s social media accounts that Father had provided to the Agency in February 2021, Hernandez's supervisor had viewed them and found no evidence that she was being trafficked or participating in child pornography as Father had then asserted. Hernandez testified that Mother had threatened to kick Ar.M. out of the home, but had never done so, and Ar.M.'s boyfriend had been cleared by the Agency's background check. Also, when Hernandez visited Mother's home, she observed that Ar.M.'s boyfriend had a separate bedroom and did not share a room with Ar.M. Hernandez admitted that the Agency had minimal contact with Father and

10

that Ar.M. continued to struggle with her mental health since being placed with Mother. She further acknowledged neither child had been attending therapy, although Ar.M. recently had resumed services. Hernandez testified that since the children were placed with Mother, Ar.M. had run away once, one child had punched Mother, and there was fighting in the home. Despite her concerns regarding Mother's parenting, Hernandez still opined placement of the children with Mother was appropriate.

After hearing arguments of counsel, the court found, by clear and convincing evidence, that the children should continue to be removed from Father's custody pursuant to section 361, subdivision (c) because there was a substantial danger to their physical health, safety, protection, or physical or emotional well-being if they were returned to his custody; the children were suffering severe emotional damage as indicated by extreme anxiety, depression, withdrawal, or untoward aggressive behavior; and there were no reasonable means by which the children's physical health could be protected without removing them from Father's physical custody. The court further found under section 361, subdivision (e) that the Agency had made reasonable efforts to prevent or eliminate the need to remove the children from Father's home. In particular, the court noted that both children had stated that placement with Father would be detrimental to their mental health and that it must take those statements seriously, given their history of suicidal ideation and hospitalization. The court stated that given the children's poor mental health and Father's recent move out of San Diego County, their mental health would be negatively affected if they were uprooted from the stability of their home and their services. The court also expressed concern regarding Ar.M.'s disclosure of sexual abuse by the paternal uncle who was living in Father's home. The court found that the

11

children had become ill due to their parents' discord and, although things were improving, more work was still needed. Based on its findings, the court ordered that the children be placed with Mother, the parents be provided with services consistent with their case plans, and Father have liberal, unsupervised visitation with the children. Father appealed.

DISCUSSION

Father contends there is insufficient evidence to support the juvenile court's May 21, 2021 ruling removing the children from his custody and finding reasonable efforts had been made to prevent their removal from him. We disagree.

A. *Relevant Juvenile Dependency Law*

After a juvenile court exercises jurisdiction over a child pursuant to section 300, it must determine the appropriate disposition for that child. (§§ 360, subd. (d), 361, 362; *In re N.M.* (2011) 197 Cal.App.4th 159, 169 (*N.M.*).) The court has broad discretion in choosing an appropriate disposition that serves the child's best interest. (*In re Nada R.* (2001) 89 Cal.App.4th 1166, 1179.) Before physically removing a child from his or her parent, the court must find, by clear and convincing evidence, that the child would be at substantial risk of harm if returned home and that there are no reasonable means to protect the child without such removal.[3] (§ 361,

---

3    As relevant here, the juvenile court may remove a child from his or her parent if the court finds by clear and convincing evidence that "[t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's . . . physical custody. . . ." (§ 361, subd. (c)(1)), or "[t]he minor is suffering severe emotional damage, as indicated by extreme anxiety, depression, withdrawal, or untoward aggressive behavior toward himself or

12

subd. (c)(1); *In re Cole C.* (2009) 174 Cal.App.4th 900, 917 (*Cole C.*); *In re Kristin H.* (1996) 46 Cal.App.4th 1635, 1654 (*Kristin H.*).)  The court must also determine whether reasonable efforts were made to prevent or eliminate the need for removal of the child from his or her home and state the facts on which its decision to remove the child is based.  (§ 361, subd. (e); see *In re D.P.* (2020) 44 Cal.App.5th 1058, 1067.)  To assist the juvenile court, the Agency must describe "the reasonable efforts [it] made to prevent or eliminate removal."  (Cal. Rules of Court, rule 5.690(a)(1)(B)(i).)

"A removal order is proper if based on proof of parental inability to provide proper care for the child and proof of potential detriment to the child if he or she remains with the parent."  (*N.M.*, *supra*, 197 Cal.App.4th at p. 169.)  In determining whether removal from a parent's home is necessary, the court may consider the parent's past conduct as well as current circumstances.  (*Cole C.*, *supra*, 174 Cal.App.4th at p. 917; *In re John M.* (2012) 212 Cal.App.4th 1117, 1126.)  An order removing a dependent child from his or her home does not require proof that the parent is dangerous or has actually harmed the child.  (*Cole C.*, at p. 917.)  The purpose of removing a child from his or her parent's home is to protect the child from future possible harm.  (*Ibid.*)

On appeal, we review the record for substantial evidence to support the juvenile court's dispositional findings and order, bearing in mind the heightened requirement of proof by clear and convincing evidence.  (*In re V.L.* (2020) 54 Cal.App.5th 147, 154-155 (*V.L.*); *Kristin H.*, *supra*, 46 Cal.App.4th at p. 1654.)  Because section 361, subdivision (c) requires proof by clear and

---

herself or others, and there are no reasonable means by which the minor's emotional health may be protected without removing the minor from the physical custody of his or her parent" (§ 361, subd. (c)(3)).

convincing evidence, we must determine "whether the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable that the fact was true." (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 995-996; see also *V.L.*, at pp. 154-155 [standard of review described in *Conservatorship of O.B.* applies to removal findings under § 361, subd. (c)].) Likewise, the substantial evidence standard of review applies to a finding under section 361, subdivision (e) that reasonable efforts were made to prevent or eliminate the need to remove a child from his or her parent. (*In re A.G.* (2017) 12 Cal.App.5th 994, 1001.) Substantial evidence is evidence that is reasonable, credible, and of solid value. (*In re Ricardo L.* (2003) 109 Cal.App.4th 552, 564.) In applying this standard, we "must view the record in the light most favorable to the prevailing party below and give due deference to how the trier of fact may have evaluated the credibility of witnesses, resolved conflicts in the evidence, and drawn reasonable inferences from the evidence." (*Conservatorship of O.B.*, at p. 996; see *V.L.*, at p. 154.) We do not consider the credibility of the witnesses or reweigh the evidence. (*In re Lana S.* (2012) 207 Cal.App.4th 94, 103; *Conservatorship of O.B.*, at p. 1008.) We must affirm an order that is supported by substantial evidence even if other evidence, or other inferences from the evidence, would have supported a contrary finding. (*In re Manuel G.* (1997) 16 Cal.4th 805, 823; *N.M.*, *supra*, 197 Cal.App.4th at p. 168.) On appeal, the parent challenging the juvenile court's order has the burden to show there is insufficient evidence to support the court's decision. (*Lana S.*, at p. 103; *N.M.*, at p. 168.)

      B. *Substantial Evidence Supports the Court's Findings and Orders*

      Father contends insufficient evidence supports the court's removal orders because the parents purportedly had corrected the harmful conduct

that precipitated the juvenile court's intervention. He focuses on his completion of certain services—including coparenting classes and individual therapy—and states the parents' communication with one another had improved. He further argues that "outside of opinions from the Agency and children," there was no evidence the children faced a substantial danger if returned to his home, and he similarly argues the evidence does not support the court's finding that reasonable efforts were made to prevent the children's removal from him.

Contrary to Father's assertions, we conclude there was substantial evidence to support the court's dispositional orders removing the children from his custody and its underlying findings that reasonable efforts were made to prevent their removal from him. The record shows that the children became dependents of the court because of their serious mental health issues, and they remained at substantial risk of harm with Father.

Prior to the filing of the instant dependency petitions, the children had been physically ill and hospitalized for mental health problems that were caused by their parents' longstanding contentious relationship. Despite placement of the children with Mother and the Agency's provision of family maintenance services, their poor mental health continued through the time of the new disposition hearing in May 2021. Both children were struggling in school, and Ar.M. continued to struggle with her mental health. Both children ceased contact with Father in October 2020 and stated that their mental health would decline if they were returned to his care.

Despite his children's serious mental health problems, and notwithstanding his completion of certain services, Father's statements to the Agency and his testimony at the contested hearing showed that he did not understand the severity of their mental health needs. Although he

15

eventually testified that he took the children's statements seriously, Father had repeatedly characterized their statements about their mental health declining if they were placed in his care as merely being a threat to get what they wanted. He also minimized the severity of their situation by claiming Mother coached the children to make these statements and the children merely wanted to remain with her because she was more lenient than him.

This was not the first time Father failed to understand his children were at risk and needed help. From the beginning of their dependency cases in November 2019 and continuing through the new disposition hearing in May 2021, Father consistently denied that his conduct had contributed to his children's mental health problems. (See *In re Gabriel K.* (2012) 203 Cal.App.4th 188, 197 ["[o]ne cannot correct a problem one fails to acknowledge"]; *In re A.F.* (2016) 3 Cal.App.5th 283, 293 ["In light of mother's failure to recognize the risks to which she was exposing the minor, there was no reason to believe the conditions would not persist should the minor remain in her home."].) Father also appeared to have no understanding of the detrimental effect on Ar.M.'s mental health if she were to live with Father in the same home as the paternal uncle whom she disclosed had sexually abused her. Father's lack of insight into his children's mental health problems was further shown by his plans for parenting them if they were placed in his care. In particular, he testified that he would use his stricter parenting style, which the court could reasonably find would be inadequate to address the children's serious mental health needs. The record supported a reasonable inference by the court that the children had made significant improvements since being placed with Mother and that progress would have been placed at risk if they were returned to Father's care—particularly because they would be uprooted and moved to Northern California, away

16

from the support systems and services they had in place in Mother's care. Father contends there was no evidence that the children were at risk "outside of opinions from the Agency and children," but he provides no valid basis for ignoring that evidence. The juvenile court could reasonably credit the evidence from the Agency and we do not reweigh the evidence on appeal. And as the court expressly stated, it had to take seriously the children's statements that their mental health would decline if they were returned to Father's care, especially given their history of suicidal ideation, hospitalizations, and mental health problems. (See *In re T.V.* (2013) 217 Cal.App.4th 126, 135-136 ["The parent need not be dangerous and the minor need not have been actually harmed before removal is appropriate. The focus of the statute is on averting harm to the child."].) Additionally, the court reasonably could credit the social worker's testimony that there were no additional services available that would allow the children to safely return to Father's care. The parents' conflict already had a profound detrimental impact on the children and the juvenile court reasonably could conclude there was a high probability the children would be at continued risk of harm unless removed from Father. The court was not required to accept Father's contention that the children were simply making idle threats to get their way.[4]

---

[4] Father additionally notes that the children were returned to his care after various hospitalizations, holds, or law enforcement contacts, and that "unmonitored visits with father remained in place." However, Father cites events that occurred in September 2019 (when he had full physical custody of the children) or mid-October 2019 (before the dependency proceedings commenced). It is unremarkable that a child would be released to a parent having sole physical custody consistent with a prior family court order. And the children refused to visit with Father with or without any supervision.

17

We further conclude there was substantial evidence to support the court's finding that the Agency made reasonable efforts to prevent or eliminate the need for the children's removal from Father's care. The record shows the Agency provided family maintenance services to Mother, Father, and the children. In particular, Father's January 2020 case plan included his participation in individual therapy and any conjoint therapy recommended by the children's therapists and his participation in a coparenting class. Despite those services, Father continued to have a contentious relationship with Mother and the children's mental health continued to suffer as a result. Father had not yet gained the necessary insight into his own role in causing the children's mental health problems and had not fully participated in services recommended by the Agency. Father does not cite to any specific service that the Agency should have, but did not, provide to him that would have prevented or eliminated the need to remove the children from his care. (See *In re H.E.* (2008) 169 Cal.App.4th 710, 725 ["reasonable efforts . . . need only be reasonable under the circumstances, not perfect"].)

In summary, there was substantial evidence to support the juvenile court's findings, under a clear and convincing standard, that the children would be placed in substantial danger if they were returned in Father's care.

Neither the children's release to Father's custody nor the visitation order supports Father's challenge to the court's May 2021 removal orders.

## DISPOSITION

The orders are affirmed.

GUERRERO, J.

WE CONCUR:

McCONNELL, P. J.

O'ROURKE, J.